HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

DON KITCH, et al.,

        Plaintiffs,

        v.

CITY OF KIRKLAND, et al.,

        Defendants.

CASE NO. C11-823RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court a motion for summary judgment from Defendants the City of Kirkland and Kirkland Police Department Detective Don Carroll. Dkt. # 8.  No one requested oral argument, and the court finds oral argument unnecessary.  For the reasons stated herein, the court GRANTS the motion in part, DENIES it in part, and directs the clerk to TERMINATE the City of Kirkland as a Defendant.

## II.  BACKGROUND

In the summer of 2010, Det. Carroll obtained search warrants and twice searched the home of Plaintiffs Don Kitch and his wife, Donna Porada-Kitch.  Det. Carroll searched their home because he suspected he would find evidence that Mr. Kitch had committed criminal insurance fraud.  Det. Carroll built that suspicion over the course of a two-and-a-half-year investigation arising from two car accidents.  Mr. Kitch and his wife

ORDER – 1

own and operate ProFormance Racing School ("ProFormance"), through which they offer driving instruction at Pacific Raceway (the "raceway") in Kent, Washington. There is no dispute that two ProFormance customers, Dr. Steven Sun and David Marcarian, crashed their high-priced cars at the raceway on September 14, 2007. The parties have a heated dispute, however, over whether Mr. Kitch instructed both customers to falsely describe the circumstances of those crashes so that they could obtain insurance coverage for the damage to their cars. The parties devote far too much attention to that dispute in the briefs and evidence they submitted to this court. This court has no need to decide whether Mr. Kitch committed a crime.

What matters in this case is whether Det. Carroll had authority to search Plaintiffs' home and whether he conducted the searches in a lawful manner. The court's discussion of the evidence therefore focuses on the facts that Det. Carroll disclosed in two applications for search warrants, whether Det. Carroll had authority to search the Kitch home, and whether he conducted his searches of their home reasonably.

## A.   Det. Carroll Investigates Mr. Kitch for Insurance Fraud.

Det. Carroll first learned of the crashes at the raceway in December 2007, when the Kirkland Police Department assigned him to investigate a report of insurance fraud from Dr. Sun's car insurance company. The insurance company provided a report of its investigation of Dr. Sun's by-then-abandoned insurance claim.[1] According to the insurance company, Dr. Sun initially claimed that he had crashed his Porsche on a "skid pad," a large level paved area at the raceway used to instruct drivers on skid recovery techniques. The insurance company discovered posts on an internet forum indicating that Dr. Sun had instead crashed while driving on the raceway's racetrack, and that another car, a Corvette, had a similar crash the same day. The day after the accident, Mr. Kitch

---

[1] For simplicity, the court refers to the acts of various employees who assisted with the investigation as acts of the insurance company. The company's report on the investigation of Dr. Sun's claim is in the record. Carroll Decl., Ex. B. It contains a day-by-day timeline that explains who was responsible for each step of the investigation.

ORDER – 2

assured the insurance company that Dr. Sun crashed on the skid pad, as did Dr. Sun when he gave a recorded statement to the insurance company. Within a few hours after his recorded statement, Dr. Sun withdrew his insurance claim. After that, Dr. Sun refused to discuss his claim with his insurance company.

Det. Carroll interviewed Dr. Sun in March 2009. Dr. Sun told him that Mr. Kitch had called him the day after the accident. Mr. Kitch told him that he believed Dr. Sun's insurance would cover the damage to his car. Dr. Sun explained that he did not believe his insurance covered his accident, because it occurred on the racetrack. Mr. Kitch told him to say that the accident occurred on the skid pad, and assured him that he and ProFormance employees would repeat that version of the accident if the insurance company approached them.

Det. Carroll learned that Mr. Marcarian was the driver of the Corvette involved in an accident at the raceway the same day as Dr. Sun's accident. Detective Carroll interviewed Mr. Marcarian in June 2008 and February 2010. Mr. Marcarian admitted that his accident occurred while he was "lapping" on the racetrack. He explained that Dr. Sun was lapping as well, but that they were not racing each other. Mr. Marcarian stated that Mr. Kitch had called him shortly after the accident and told him that he should file an insurance claim and state that his accident occurred on the skid pad. Mr. Marcarian declined to make an insurance claim. He also told Det. Carroll that after he posted information about both his accident and Dr. Sun's accident in an internet forum, Mr. Kitch called him and demanded that he remove the information because he feared that insurance companies monitored the forum. Mr. Marcarian also said that he had spoken with another ProFormance customer who told him that he had successfully made an insurance claim after falsely telling his insurance company that his car accident happened on the skid pad rather than the racetrack. There is no evidence, however, that Mr. Marcarian told anyone that Mr. Kitch had encouraged this customer to file a false claim.

ORDER – 3

Mr. Kitch denies that he instructed any customer to file a false insurance claim. Mr. Kitch has no evidence, however, that Det. Carroll's accounts of the statements of Dr. Sun and Mr. Marcarian are inaccurate. Det. Carroll had ample reason to believe their statements instead of Mr. Kitch's denials.

**B.    Det. Carroll Obtains a Search Warrant.**

Det. Carroll appeared before a King County Superior Court judge to apply for a search warrant on June 10, 2010. He declared that he had probable cause to believe that Mr. Kitch had conspired to submit a false insurance claim, in violation of RCW § 48.30.230.[2]

Det. Carroll submitted a nine-page affidavit in support of his warrant application. Carroll Decl., Ex. E. That affidavit discloses a wealth of information supporting Det. Carroll's suspicions about Mr. Kitch. For the most part, however, the affidavit does not explain how Det. Carroll learned the facts he disclosed. The only investigative steps that Det. Carroll disclosed in his affidavit were his interviews with Dr. Sun and Mr. Marcarian. A review of additional evidence that Det. Carroll submitted to this court reveals that Det. Carroll did much more than merely interview Dr. Sun and Mr. Marcarian,[3] but he did not disclose that in his affidavit. His affidavit did explain that he believed that ProFormance's business records would provide additional evidence of Mr.

---

[2] RCW § 48.30.230 makes it a crime to knowingly "[p]resent, or cause to be presented, a false or fraudulent claim, or any proof in support of such a claim, for the payment of loss under a contract of insurance" or to prepare or submit a false document with intent to use it to support an insurance claim.

[3] After he completed the searches of Plaintiffs' home, Det. Carroll submitted a probable cause statement, which he signed under penalty of perjury, to the King County Prosecutor's Office. Carroll Decl., Ex. A. That statement reveals that, among other things, Det. Carroll spoke with Mr. Kitch and his attorney in a June 2008 conference call. Det. Carroll's declaration to this court also makes explicit that he relied on the insurance company's investigative report in his own investigation. Carroll Decl. ¶ 4. Det. Carroll's declaration also incorporates the statements in his official summary of the investigation. Carroll Decl., Ex. F. Finally, Det. Carroll's declaration includes a transcript of his February 2010 interview with Mr. Marcarian. Carroll Decl., Ex. C.

ORDER – 4

Kitch's crime.  The only location he identified at which he expected to find those records was ProFormance's office at the raceway.

The judge issued a search warrant permitting Det. Carroll to search ProFormance's raceway office to seize records of accidents, liability waivers, and a customer list. Carroll Decl., Ex. E (Jun. 10, 2010 warrant).  The warrant also permitted him to search for records at a business that provided paramedical services at the raceway.  *Id.*

## C.   Det. Carroll Searches Plaintiffs' Home Without a Warrant.

To execute the warrants at the raceway office and the paramedical service on June 16, 2010, Det. Carroll assembled a team of eight people, including three Kirkland police officers, two King County deputy prosecutors, two investigators assigned to the Washington Insurance Commissioner's office, and a Secret Service agent.  Carroll Decl., Ex. F.  For simplicity's sake, the court will refer to the team members as "officers."  He sent five officers to ProFormance's raceway office, and he accompanied the other three to the paramedical service.  The five officers who went to the raceway found the ProFormance office locked and unoccupied.  They relayed that information to Det. Carroll.  Det. Carroll called Mr. Kitch to ask him to come to the raceway office to open the door, explaining that he had a warrant to search for business records.  Mr. Kitch told him that there were no records at the raceway office and that he kept ProFormance records in an office within his Newcastle home.  Mr. Kitch agreed to meet Det. Carroll at his home at noon that day.  Det. Carroll left officers from his team to complete the search of the raceway office.

Det. Carroll arrived at the Kitch home at about noon.  Mr. Kitch was there, as were his wife and a woman named Ashby Conwell.  There is no evidence that Det. Carroll explicitly asked anyone for consent to enter the Kitch home.  He claims that he showed the search warrant to Mr. Kitch and Ms. Porada-Kitch, but explained that it covered only ProFormance's raceway office.  According to Mr. Kitch and his wife, Det. Carroll did not

ORDER – 5

ask for consent to enter, he simply walked in to their home when Mr. Kitch opened the door. Kitch Decl. at 13; Porada-Kitch Decl. ¶ 4. They claim that he told them that he had a warrant, and displayed a portion of it to Mr. Kitch, but he did not reveal that the warrant did not permit him to search their home. *Id.* They cooperated with his demands only because they believed he had a warrant to search their home. *Id.* Ms. Conwell confirms that Det. Carroll did not ask for consent to enter or to search and that he conveyed the impression that he had a warrant to search the house. Conwell Decl. ¶ 2.

According to Det. Carroll, he arrived at the Kitch home with only one other officer. Carroll Decl., Ex. F. He admits that four more officers arrived later, having completed their search of ProFormance's raceway office. *Id.* Ms. Conwell claims that three officers arrived initially, but claims that it "seemed like six or eight officers" in addition to Det. Carroll entered the home. Conwell Decl. ¶2. While she was working in the home office, she claims that eight officers entered the office, which comfortably held only three people. *Id.* ¶ 6. Ms. Porada-Kitch contends that Det. Carroll arrived at the house "along with at least six or more officers." Porada-Kitch. Decl. ¶ 4. Similarly, Mr. Kitch declares that Det. Carroll arrived with "at least six or more officers." Mr. Kitch, his wife, and Ms. Conwell all claim that they were intimidated by the number of officers in their home as well as their prominent display of their sidearms.

Once he was inside the home, Det. Carroll claims that Mr. Kitch and Ms. Porada-Kitch pointed to a file box located in a one-room home office and told him that they kept ProFormance customer records there. They also showed him a file that contained customer waivers. Det. Carroll claims that Ms. Porada-Kitch showed him a computer in the office containing a database file with customer information. He contends that she copied the file to a portable storage device. Plaintiffs then left for a 1:00 p.m. appointment, leaving Ms. Conwell alone with the officers.

ORDER – 6

Ms. Conwell explains that after Mr. Kitch and Ms. Porada-Kitch left for their appointment, Det. Carroll and as many as eight other officers continued their search until just after 2:30 p.m. Conwell Decl. ¶¶ 3-12. They left, and Mr. Kitch and Ms. Porada-Kitch returned just a few minutes later. *Id.* ¶ 12.

At some point in his search of the Kitch home, Det. Carroll determined (after perhaps consulting with a deputy prosecutor) that "it would be better to obtain an addendum to the search warrant listing [Plaintiffs' home address] and then conduct a second search." Carroll Decl., Ex. F at p. 8 of 30. He erased the portable electronic storage device and did not take any documents from the house. *Id.*

**D.     Det. Carroll Obtains a Second Warrant and Searches the Kitch Home Again.**

On June 29, 2010, Det. Carroll returned to the same judge from whom he had obtained the first warrant. His new affidavit said nothing about his first search of the Kitch home. Carroll Decl., Ex. G. Instead, he described the execution of the original warrant at ProFormance's raceway office. *Id.* He also described his phone call to Mr. Kitch wherein Mr. Kitch revealed that he kept ProFormance's records at his home office. *Id.* Det. Carroll asked for a warrant to search the home office because the records his team found at the raceway office were "incomplete." *Id.* The judge issued a warrant for the same business records, but this time authorized a search at the Kitch home.

Three days later, Det. Carroll arrived at the Kitch residence. No one was home. One of the officers accompanying him, Det. Joseph Indahl, discovered that a vehicle parked in the driveway was unlocked. Indahl Decl. ¶ 1. He opened it, found a garage door opener, and opened the garage. Once inside the garage, Det. Carroll entered the house, went to the home office, and seized both the documents and the electronic file that he had seen during his first search. Mr. Kitch disputes that he left the car unlocked, contending instead that Det. Carroll or a subordinate officer used a "slim jim" device to break into it.

ORDER – 7

No charges ever came of Det. Carroll's two-and-a-half-year investigation of Mr. Kitch.  The King County Prosecutor declined to charge Mr. Kitch with anything.  Carroll Decl., Ex. I (Sept. 14, 2010 declination statement).

Instead of a criminal charge against Mr. Kitch, Det. Carroll got a civil suit from Mr. Kitch and his wife.  They claim that he is liable, via 42 U.S.C. § 1983, for violating their rights under the Fourth Amendment of the United States Constitution.  They also claim liability arising under the Washington Constitution's Fourth Amendment analog.  Wash. Const. Art. I, § 7.  In addition, they raise Washington claims for intentional and negligent infliction of emotional distress as well as interference with economic relations.  They sued Det. Carroll and the City of Kirkland, his employer.

The court now turns to the Defendants' motion for summary judgment against each of these claims.

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The court defers to neither party in resolving purely legal questions.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

ORDER – 8

A.    **Plaintiffs' Section 1983 Claim for Fourth Amendment Violations**

Section 1983 provides a remedy for a plaintiff who proves that a defendant acting under color of state law violated her constitutional rights. Plaintiffs claim that Det. Carroll violated their Fourth Amendment rights in three ways: by searching their home a first time without a warrant and without their consent, by relying on warrants issued without probable cause; and by the manner in which he executed both searches.

Det. Carroll raises the defense of qualified immunity, which protects § 1983 defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A defendant successfully invokes qualified immunity either by showing that a plaintiff has not alleged (or provided evidence for, depending on the stage of litigation) facts amounting to a violation of a constitutional right or that the right was not "clearly established" at the time of the defendant's violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court has discretion to consider either portion of the qualified immunity test first. *Id.* at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001)).

The court now considers each of Plaintiffs' claimed Fourth Amendment violations.

1.    **Disputed Facts Prevent the Court from Determining If Plaintiffs Consented to Det. Carroll's Warrantless Search of Their Home.**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV. In the ordinary case, a government agent wishing to search someone's home must obtain a search warrant. *Payton v. New York*, 445 U.S. 573, 586 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). In this case, Det. Carroll had a search warrant on June 16, 2010, but he had

ORDER – 9

no warrant to search Plaintiffs' home.  His search, like any warrantless search of a person's home, is thus presumptively unreasonable.  *See Payton*, 445 U.S. at 586.

The only effort Det. Carroll makes to rebut the presumption that his initial search was unreasonable is to contend that Plaintiffs gave him consent to search.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) ("[A] search conducted pursuant to a valid consent is constitutionally permissible.").  In a civil case, the burden is on the plaintiff to prove that he or she did not consent to a search.  *Pavao v. Pagay*, 307 F.3d 915, 919 (9th Cir. 2002).  A court must consider the totality of the circumstances to determine whether a search was consensual.  *Id.*; *see also Schneckloth*, 412 U.S. at 232-33; *United States v. Chan-Jiminez*, 125 F.3d 1324, 1327 (9th Cir. 1997) (discussing factors relevant to consent inquiry).  Consent means nothing, however, unless it is "freely and voluntarily given."  *Chan-Jiminez*, 125 F.3d at 1327.

Disputes of fact prevent the court from determining as a matter of law that Plaintiffs consented to Det. Carroll's search.  To begin, both Mr. Kitch and Mrs. Porada-Kitch deny that they consented.  Indeed, they do not even admit that Det. Carroll asked for their consent, they say that he simply entered their home when Mr. Kitch answered the door.  Once inside, Det. Carroll showed them a warrant, but there is no dispute that the warrant he had gave him no authority to search the Kitch home.  Plaintiffs state that they assisted Det. Carroll with his quest for ProFormance's business records only because they believed that he had a warrant to search their home.  When a property owner "consents" to a search because the officer conducting the search falsely purports to have a warrant, the consent is coerced and invalid.  *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding that the burden of proving consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority").

The court has come up nearly emptyhanded in its quest for any evidence that a reasonable officer in Det. Carroll's position could have concluded that he had consent to

ORDER – 10

search.  Det. Carroll neither explicitly contends that he asked for consent to search Plaintiffs' home nor that they gave it to him.  *See Chan-Jimenez*, 125 F.3d 1324 (noting that failure to inform suspect that he could refuse consent is relevant to voluntariness). The only mention of Plaintiffs' alleged consent comes in the motion now before the court, where Det. Carroll's counsel has constructed a consent argument for him.  With no evidence that Plaintiffs expressly consented to a search, the court is left to determine whether Det. Carroll could have inferred their consent from their words or conduct. *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979) ("The existence of consent to a search is not lightly to be inferred, and is a question of fact to be determined from the totality of circumstances."); *Pavao*, 307 F.3d at 919 (evaluating claim of inferred consent).  Det. Carroll contends that he told Plaintiffs that his warrant applied only to the ProFormance raceway office.  From that, a factfinder could conclude that Det. Carroll construed Plaintiffs' cooperation in pointing out the location of their business records as consent.  A reasonable factfinder might also infer consent from Mr. Kitch's agreement to meet Det. Carroll at his home after informing him that all ProFormance records were at his home office.  Because it is possible that a factfinder could infer Plaintiffs' consent from this evidence, the court declines to enter summary judgment against Det. Carroll.

## 2.    Probable Cause Supported Both Search Warrants.

The Fourth Amendment commands that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const., Amend. IV.  In the context of determining probable cause to search, the question for a judicial officer reviewing an application for a search warrant is to decide "whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*,

462 U.S. 213, 238 (internal quotes omitted).  A court reviewing a decision to issue a warrant considers only whether the judicial officer had a substantial basis to believe that probable cause existed.  *Id.* at 238-39.

The court considers both of the warrants Det. Carroll obtained, even though the first one is likely irrelevant because it did not authorize a search of the Kitch home.  The affidavits that Det. Carroll submitted for each warrant are identical, except that the second affidavit discloses the results of the search of the raceway office as well as the telephone conversation where Mr. Kitch revealed to Det. Carroll that he kept ProFormance records at his home.

The court's analysis of whether Det. Carroll's search warrant affidavits supported a probable cause determination need go no further than his reliance on his interviews with Mr. Marcarian.  Plaintiffs contend that Det. Carroll's warrant improperly relied on hearsay, including Mr. Marcarian's statements.  For at least 50 years it has been settled law that a judicial officer may rely on hearsay when considering a warrant affidavit.  *Jones v. United States*, 362 U.S. 257, 271 (1960) ("We conclude therefore that hearsay may be the basis for a warrant."), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83, 84 (1980); *Gates*, 462 U.S. at 241-42 (citing *Jones*).  A judicial officer must consider the source of a hearsay statement, including the manner in which the affiant learned of it.  *Gates*, 462 U.S. at 242.  Statements from a citizen informant who identifies himself are "generally presumed reliable."  *Ewing v. City of Stockton*, 488 F.3d 1218, 1224 (9th Cir. 2009); *see also Gates*, 462 U.S. at 233-34 (observing that when an "honest citizen comes forward with a report of criminal activity – which if fabricated would subject him to criminal liability – we have found rigorous scrutiny of the basis of his knowledge unnecessary").  Mr. Marcarian had no apparent motivation to lie to Det. Carroll.  Unlike Dr. Sun, he had declined to make an insurance claim, and thus had no fear of adverse consequences.  He described how Mr. Kitch counseled him to lie in

ORDER – 12

support of an insurance claim.  He described how Mr. Kitch revealed to him that he had given the same instructions to Dr. Sun.  Moreover, he explained why he believed that another ProFormance customer committed insurance fraud, which bolstered the suspicion that Mr. Kitch made a practice of helping ProFormance customers falsify claims.  That, in turn, supported the suspicion that ProFormance's business records might reveal evidence not only of fraud with respect to Dr. Sun and Mr. Marcarian, but with respect to past or future customers.  Det. Carroll's description of Mr. Marcarian's statements, standing alone, sufficed to give the judge probable cause to issue the warrants.

Of course, Mr. Marcarian's statement did not stand alone.  Det. Carroll's affidavit also relied on his interview of Dr. Sun.  Dr. Sun's statements are inherently less trustworthy because, unlike Mr. Marcarian, he followed Mr. Kitch's instructions to falsify an insurance claim.  A neutral magistrate might well have queried whether Dr. Sun was merely attempting to shift blame elsewhere or curry favor from law enforcement.  By itself, Dr. Sun's statement would perhaps be insufficient to support probable cause.  But, as corroboration for Mr. Marcarian's statement, Dr. Sun's statement provided additional support for a probable cause determination.

Minimizing Mr. Marcarian's statement, Plaintiffs contend that Det. Carroll's affidavit contained numerous intentionally false statements.  For the most part, they fail to identify the allegedly false statements, much less provide evidence that Det. Carroll knew they were false.  Putting that aside, Plaintiffs ignore the legal standard that applies.  They must show not only that Det. Carroll "deliberately or recklessly made false statements or omissions," they must show that those statements or admissions were "material to the finding of probable cause."  *Ewing*, 588 F.3d at 1223.  To determine if statements or omissions are material, a court considers the search warrant affidavit as if it contained every alleged omission but was purged of every false statement.  *Id.* at 1224.  The court alone, not a jury, decides whether omissions or false statements are material.

ORDER – 13

*Id.* Plaintiffs wholly fail to point to any false statement or omission which, if cured, would undermine Mr. Marcarian's statement.[4]  Even if Det. Carroll had lied repeatedly about virtually everything else in the affidavit (and the court emphasizes that there is no evidence that he did), he did not lie about Mr. Marcarian's statement.  It sufficed to establish probable cause.

Plaintiffs' contention that no judicial officer could have found probable cause because Mr. Kitch had no motive to assist his customers with insurance fraud is unpersuasive.  While Det. Carroll had no direct evidence of Mr. Kitch's motive, at least one motive is readily apparent.  Helping his customers receive money after they crashed at his raceway would help secure their patronage in the future.

The court also rejects the notion that there was no probable cause to support the warrant because the statute of limitations had passed on Mr. Kitch's crime.  The court hesitates to address this issue, because Plaintiffs raised it in only a single sentence of their opposition to Defendants' summary judgment motion.  Pltfs.' Mot. at 8.  Defendants, however, anticipatorily raised the issue, likely because Plaintiffs' counsel had addressed it in his pre-litigation correspondence.  The sole criminal statute that Def. Carroll cited in his warrant application was RCW § 48.30.230, which prohibits the submission of a false insurance claim, making it a gross misdemeanor if the claim seeks $1500 or less, and a class C felony otherwise.  Det. Carroll contended that Mr. Kitch had conspired to violate the statute.  In Washington, conspiracy to commit a crime is a misdemeanor if the crime itself is a gross misdemeanor, and a gross misdemeanor if the crime itself is a Class C felony.  RCW § 9A.28.040.  The catchall limitations period is three years for a felony,

---

[4] Although no one raises the issue, Det. Carroll omitted from his second affidavit any disclosure of his warrantless search of Plaintiffs' home.  It seems apparent that he did so because he did not want to taint his affidavit by supporting it with potentially inadmissible evidence.  His disclosure that Mr. Kitch had told him on the telephone that he kept ProFormance's business records at home was sufficient, combined with the facts he disclosed in his first affidavit, to support a warrant for the search of his home.  Mr. Kitch does not dispute that he told Det. Carroll that he kept ProFormance records at his home.

ORDER – 14

two years for a gross misdemeanor, and one year for a misdemeanor.  RCW § 9A.04.080.

Plaintiffs' argument, to the extent they have made one, is that by the time Det. Carroll

approached the judge in June 2010, more than two years had passed since the events

immediately following the September 2007 accidents at the raceway, and thus the two-

year statute of limitations had passed for the gross misdemeanor of conspiracy to commit

the class C felony described in RCW § 48.30.230(2)(b).

Plaintiffs' reliance on the statute of limitations is of no benefit to them.  First, Det.

Carroll sufficiently disclosed at least approximate dates for all relevant events in his

warrant affidavit.  The judge knew that the accidents occurred in September 2007 and

that Mr. Kitch's efforts to persuade Dr. Sun and Mr. Marcarian to file false claims

occurred shortly thereafter.  The judge nonetheless concluded that there was probable

cause to search.  The judge was correct.  There is no Ninth Circuit authority for the

proposition that the Fourth Amendment requires a judicial officer to consider the statute

of limitations when issuing a search warrant.  A criminal defendant may raise an expired

limitations period as an affirmative defense.  That defense, however, has nothing to do

with whether the defendant actually committed the crime, which is the question relevant

to probable cause in a warrant application.  So far as the court is aware, every court to

address this issue has found that a judicial officer reviewing a warrant application need

not consider whether the limitations period has passed.  *Pickens v. Hollowell*, 59 F.3d

1203, 1207-08 (11th Cir. 1995); *Sands v. McCormick*, 502 F.3d 263, 269 (3d Cir. 2007);

*see also State v. Fry*, 228 P.3d 1, 7 (Wash. 2010) (finding affirmative defense of medical

authorization does not negate probable cause for warrant in marijuana possession case).[5]

The court need not decide whether the statute of limitations bears on a judicial officer's

---

[5] At least one court has suggested that an arrest or search after the expiration of the statute of limitations for the underlying crime could violate the Fourth Amendment's prohibition on unreasonable searches and seizures.  *United States v. Martin*, 399 F.3d 879, 881 (7th Cir. 2005). No court has suggested, however, that the expiration of the limitations period undermines the existence of probable cause to obtain a warrant for a search or arrest.

ORDER – 15

1   review of a warrant application.  Even if that were so, there is no clearly established law

2   that would have put Det. Carroll on notice of this legal requirement.  Putting that aside, it

3   is far from clear that consideration of the statute of limitations would have made any

4   difference in this case.  First, it is not at all clear when Mr. Kitch's alleged criminal

5   conspiracy ended, particularly where there was probable cause to believe he continued to

6   conspire with other customers as he had with Dr. Sun and Mr. Marcarian.  Second, even

7   though Det. Carroll identified only Mr. Kitch's conspiracy to violate RCW § 48.30.230 in

8   his affidavit, he also had probable cause to charge him with a direct violation of the

9   statute.  *See Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004) (holding that probable

10  cause does not depend on which crime an officer invokes as a basis for an arrest).  Det.

11  Carroll's affidavit was within the three-year limitations period for that crime.

> ### 3.   Disputed Facts Prevent the Court from Deciding If Det. Carroll Conducted the First Search Reasonably, But His Second Search Was Reasonable As a Matter of Law.

14       The court now considers whether Det. Carroll acted unreasonably in his execution

15  of the searches of the Kitch home.  Even where there is probable cause for an arrest or

16  search, the Fourth Amendment demands that the manner of the search or arrest be

17  reasonable.  *See*, *e.g.*, *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (noting that the

18  validity of a search warrant and the reasonableness of the manner of its execution are

19  "two separate constitutional issues").  Where a warrant or other circumstances give

20  officers a right to enter and search a home, the officers have a right to occupy and control

21  the property.  *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*,

22  402 F.3d 962, 971 (9th Cir. 2005).  They must nonetheless exercise those rights

23  reasonably, balancing the justification for the search against the degree of intrusion

24  necessary to accomplish it.  *Id.*; *see also United States v. Ankeny*, 502 F.3d 829, 836 (9th

25  Cir. 2007) (describing balancing test).

ORDER – 16

As to Det. Carroll's first search of the Kitch home,[6] the court has already found that factual disputes prevent the court from deciding whether the search was consensual. Even if Plaintiffs had consented, however, there remain disputed factual questions that prevent the court from deciding whether Det. Carroll conducted the search reasonably. There is no evidence that he or his team destroyed or damaged property in their search. There is evidence, however, that Det. Carroll used as many as eight officers to conduct the search and that those officers traipsed into areas of the house other than the home office. Plaintiffs also allege that the officers pointedly displayed (but did not brandish) their sidearms, and otherwise attempted to intimidate them. There is no evidence that Det. Carroll needed eight officers to conduct the search, particularly after he knew that the business records he was searching for were in one room. *See Wilson v. Layne*, 526 U.S. 603, 611 (1999) ("[T]he Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion."). There is no evidence that Plaintiffs or Ms. Conwell presented any threat to the officers. Under these circumstances, a jury could conclude that Det. Carroll conducted the first search in an unreasonable manner.

Det. Carroll's second search of the Kitch home presented a different situation. This time, nobody was home. Plaintiffs contend that he acted unreasonably because he broke into a car in their driveway to gain entrance into their house and because he declined to notify them in advance of his search.

No clearly established law would have put Det. Carroll on notice that he needed to contact Plaintiffs to request their presence at their home when he conducted the second search. The court is aware of no Ninth Circuit or Supreme Court authority squarely addressing this question. Several circuit courts have rejected the notion that police with a

---

[6] Plaintiffs have not sued any officer involved in the searches except Det. Carroll. Det. Carroll was undisputedly in charge of the searches, and thus is liable for the actions of his subordinate officers. *Hells Angels*, 402 F.3d at 970.

ORDER – 17

warrant must contact the occupants or owner of an unoccupied building before searching it. *E.g.*, *United States v. Gervato*, 474 F.2d 40, 41 (3d Cir. 1973) (finding no Fourth Amendment violation where police watched defendant leave his apartment, then entered); *United States v. Stefonek*, 179 F.3d 1030, 1034 (7th Cir. 1999) (finding no Fourth Amendment right to advance notice of search); *United States v. Agrusa*, 541 F.2d 690, 697-98 (8th Cir. 1976) ("What authority there is holds that unannounced and forcible entries into vacant premises, even homes, in order to conduct a search, are constitutional in the *absence* of exigent circumstances . . . .") (emphasis in original).  The court need not decide whether the Fourth Amendment ever mandates notice to the homeowner before executing a warrant to search her home while she is not present.  It suffices to conclude that no clearly established law would have advised Det. Carroll of the necessity of notice in this case.

Det. Carroll also did not violate the Fourth Amendment by entering Plaintiffs' car to open their garage door.  Plaintiffs contend that Det. Carroll falsely claimed that the vehicle was unlocked, and that he directed a member of his team to use a "slim jim" device to unlock it.  To support this allegation, they rely on two declarations from witnesses who declared in October 2011 (at least 15 months after the search) that they "recently" inspected the car and saw scratches on the driver-side window indicating a forcible entry.  Faciane Decl.; Powell Decl.  This evidence is not admissible.  Neither declarant provides any evidence that they are qualified to make an assessment of the cause of the scratches or when the scratches occurred.  Even if the court were to accept Plaintiffs' unsupported allegation that Det. Carroll or his team forcibly entered the car, they ignore that officers may use force to enter premises they are lawfully permitted to search.  *Ankeny*, 502 F.3d at 836; *Dalia v. United States*, 441 U.S. 238, 258 (1979) ("[O]fficers executing search warrants on occasion must damage property in order to perform their duty.").  The officers caused, at most, minimal damage to the car.  There is

ORDER – 18

no evidence that they had a less intrusive means of entering the home.  They did not, as a matter of law, violate the Fourth Amendment.

**B.    Plaintiffs Abandoned Their State Law Claims and Their Claims Against the City of Kirkland.**

Plaintiffs provided at least some evidence and argument to support their contention that Detective Carroll violated the Fourth Amendment.  By contrast, they wholly ignored that Defendants moved for summary judgment on their Washington law claims and their claims against the City.  The court finds that Plaintiffs have abandoned these claims.  *Estate of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011) (holding that plaintiff abandoned claim by failing to raise it in opposition to summary judgment motion).  Although the court need not consider the abandoned claims further, the court examines each briefly to show that Defendants' motion provides a basis for granting summary judgment against them.

**1.     State Law Claims Against Det. Carroll**

Plaintiffs contend that Det. Carroll violated Article I, section 7, the Fourth Amendment analog within the Washington Constitution.  They ignore that Washington provides no private cause of action for damages for violations of this provision.  *Reid v. Pierce County*, 961 P.2d 333, 342-43 (Wash. 1988).

Plaintiffs contend that Det. Carroll negligently or intentionally inflicted emotional distress on them.  Even under the most charitable view of Plaintiffs' description of Det. Carroll's conduct, he and his officers did not engage in the sort of "extreme and outrageous conduct" that Plaintiffs must prove to prevail on a claim of intentional infliction of emotional distress.  *Dicomes v. State of Washington*, 782 P.2d 1002, 1013 (Wash. 1989) (concluding that court may dismiss claim if reasonable minds could not differ over whether conduct was extreme and outrageous).  A claim of negligent infliction of emotional distress requires proof of objective symptoms of emotional distress.  *Hegel*

ORDER – 19

*v. McMahon*, 960 P.2d 424, 431 (Wash. 1998) (requiring emotional distress "susceptible to medical diagnosis and provable through medical evidence").  Plaintiffs offer no objective evidence of emotional distress.

Plaintiffs' claim of interference with their economic relations apparently stems from their belief that customers and members of the public witnessed the execution of the warrant at ProFormance's raceway office and drew negative conclusions.  Even if this is true, a claim of interference with a contractual relationship or business expectancy requires proof of an improper purpose or the use of improper means.  *Leingang v. Pierce County Med. Bureau, Inc.*, 930 P.2d 288, 301 (Wash. 1997).  Det. Carroll's authorized his team to search the raceway office for the proper purpose of executing a valid search warrant, and there is no evidence that his team used improper means in conducting that search.

### 2.    Claims Against the City

Plaintiffs have named the City of Kirkland as a Defendant, but they do not allege that the City itself took any action.  As to Plaintiffs' § 1983 claims, the City can be liable only if one of its policies or customs was a moving force behind the constitutional violation that they suffered.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Plaintiffs provided no evidence of any City policy or custom, much less one that caused them harm.  If Plaintiffs had a valid Washington law claim against Det. Carroll, they could potentially invoke respondeat superior principles to hold the City liable.  The court's entry of summary judgment against Plaintiffs' state law claims disposes of that possibility.

### IV.   CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part Defendants' motion for summary judgment.  Dkt. # 8.  The court grants summary judgment against Plaintiffs' § 1983 claims alleging Fourth Amendment violations except

ORDER – 20

those based on their lack of consent to Det. Carroll's initial search of their home and the manner in which he conducted his first search.  The court grants summary judgment against Plaintiffs' Washington law claims as well as their claims against the City of Kirkland.  The court directs the clerk to TERMINATE the City as a Defendant.

DATED this 19th day of March, 2012.


The Honorable Richard A. Jones
United States District Court Judge

ORDER – 21